UNITED STATES DISTRICT COURT
FOR THE
DISTRICT COURT OF CONNECTICUT

----------------------------------------------------------------X

COMMERCIAL UNION INSURANCE
COMPANY,                                                    Civil No.  3:03 CV 1046 (AWT)

                              Plaintiff,              **AFFIDAVIT**

        -against-

FRANKLIN LORD and SHARON SHUMAN              March 26, 2004


                              Defendants.
----------------------------------------------------------------X

STATE OF NEW YORK     )
                                       :ss.:
COUNTY OF NEW YORK   )

        DAVID R. HORNIG, being duly sworn deposes and says:

        1.      I am an attorney duly admitted in New York and Texas and I am a

member of Nicoletti Hornig Campise Sweeney & Paige the attorneys for the plaintiff

COMMERCIAL UNION INSURANCE COMPANY (hereinafter "Commercial Union").  I am

admitted as a visiting attorney for this case in the United States District Court for Connecticut.

As such I am familiar with all the proceedings in this case.

        2.      On June 12, 2003 Commercial Union commenced this action seeking a

declaratory judgment that the marine policy of insurance issued to the defendants FRANKLIN

LORD and SHARON SHUMAN (hereinafter sometimes referred to as "the defendants") was

void ab initio on the grounds that the defendants had failed to disclose material facts and had

made material misrepresentations of fact when applying for marine insurance for the

WANDERLUST. A copy of the Complaint is annexed hereto as Exhibit "1". On June 30, 2003 the defendants filed an Answer a copy of which is annexed hereto as Exhibit "2".

3.    On October 1, 2003 pursuant to notice Franklin Lord and Sharon Shuman testified at a deposition. A copy of the transcript of the deposition of Franklin Lord is annexed hereto as Exhibit "3" and a copy of the transcript of the deposition of Sharon Shuman is annexed hereto as Exhibit "4".

4.    On November 6, 2003 pursuant to notice the deposition of Salvatore Messina was conducted in Norfolk, Virginia. A copy of Salvatore Messina's deposition transcript is annexed hereto as Exhibit "5".

5.    Commercial Union has produced pursuant to Rule 26 a copy of their complete underwriting file related to marine insurance Policy No. CPJ E00752 (hereinafter the "policy"). The above-mentioned pleadings, documents and transcripts establish the facts upon which summary judgment should be granted. In support of Commercial Union's Motion for Summary Judgment, a Memorandum of Law and a Local Rule 56 (a)1 statement are submitted in support of this Motion.

6.    The well-settled principles of marine insurance law are discussed in the Memorandum of Law. An applicant for marine insurance has a duty to fully and completely disclose all aspects of the risk to be insured. Because of the nature of marine insurance they are governed by the doctrine of *uberrimae fidei,* or upmost good faith. The doctrine of *uberrimae fidei* requires the applicant for insurance to spontaneously disclose to the insurer all facts material to the risk when applying for coverage, even if the insurer fails to inquire. The leading Supreme Court case on the doctrining *uberrimae fidei* describes the insured's obligation to disclose as follows:

> The insured will not be allowed to protect himself against the charge of an undue concealment, by evidence that he had disclosed to the underwriters, in general terms, the information he possessed. <u>Where his own information is specific, it must be communicated in the terms in which it was received.  General terms may include the truth, but fail to convey it with its proper force and in all its extent.</u>  Nor will the assured be permitted to urge, as an excuse for his omission to communicate material facts, that they were actually known to underwriters, unless it appears that their knowledge was as particular and full as his own information. It is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging the value of the risks; and when any circumstance is withheld, however, slight and immaterial it may have seemed to himself, that, if disclosed, would have probably influenced the terms of the insurance, the concealment vitiates the policy.

<u>Sun Mut. Ins. Co. v. Ocean Ins. Co.</u>, 107 U.S. 485 (1883) (emphasis added).

       7.     In 1984 a designer of computers Salvatore Messina (hereinafter "Messina") retired from Interdata. (Messina Tr. 4) [1]  Messina had the ambition to build a seagoing yacht (Messina Tr. 4). In 1984, Messina visited various yacht builders, including traveling to Ontario, Canada on several occasions to visit the facilities of Kanter Yachts (Messina Tr. 6).  On April 19, 1984, Messina purchased a steel hull for $18,000.00 to $23,000.00 from Kanter (Messina Tr. 39) and arranged to have it delivered to Seabright, New Jersey (Messina Tr. 6-7, 15).  Messina did not purchase or receive Kanter's plans and specifications for their 50-foot yacht (Messina Tr. 7).  In fact, Messina prepared his own plans that were never formally reviewed by a naval architect (Messina Tr. 5, 8).

---

[1] The reference "Messina Tr._" refer to page of Salvatore Messina's transcript a copy of which is marked as Exhibit 5.

8.      The various components for building the vessels including, but not limited to the engines, generators, and lumber were purchased by Messina during the twelve (12) years that he worked on completing the vessel (Messina Tr. 9). Messina purchased a diesel engine in 1984 or 1985 which he installed on the vessel (Messina Tr. 10, 31). While the vessel was in New Jersey, Messina installed the aft head (bathroom on a boat) (Messina Tr. 16), aft state room, ceilings (not overhead, as ashore; planking or plywood sheeting on the inside of the frame; i.e., walls), soles (floor on a boat) (Messina Tr. 16), insulation (Messina Tr. 34), temporary hatches (Messina Tr. 18), framed out the pilot house, installed benches and built a chart table (Messina Tr. 17), installed bulkheads (Messina Tr. 25) and installed the steering system (Messina Tr. 49).

9.      In 1987, Messina moved to Virginia and had the partially built vessel moved by over land transport (Messina Tr. 17, 19). While in Virginia, Messina installed a sub deck and some teak decking (Messina Tr. 19), framed out the galley and kitchenette (Messina Tr. 20), water proofed the water tanks (Messina Tr. 20), installed rudder shafts, fuel lines, insulation in the engine room, installed engine controls, temporarily installed the helm, installed hatches and watertight bulkheads (Messina Tr. 21). While in Virginia, Messina purchased sufficient cherry wood to complete the vessel (Messina Tr. 21), bought basic electrical equipment (Messina Tr. 25), temporarily installed windows and hatches [just needed to be screwed in to be permanent] (Messina Tr. 25) and did painting (Messina Tr. 25). Messina invested approximately $48,000.00 in purchasing the hull from Kanter and purchasing equipment to complete building the vessel (Messina Tr. 38).

10.     Messina decided to sell the partially completed Kanter because he developed allergies to the epoxies he was using (Messina Tr. 36). Messina used Deltaville

4

Yacht Sales as a broker and described the vessel as a partially completed 50-foot steel boat (Messina Tr. 37). The partially completed vessel was identified as a "1984 Kanter yacht" (Messina Tr. 55). Messina was personally of the opinion that the vessel was 50% completed at the time that he sold it (Messina Tr. 49-50). The partially completed vessel was sold to Franklin Lord for $48,000.00 on August 20, 1996 (Messina Tr. 39). Messina believed that the partially completed vessel was sold with everything needed to complete the vessel short of deck hardware, rigging, anchor and windless (Messina Tr. 40-41). Several weeks after the sale of the vessel to Franklin Lord, Messina observed Lord motor away from Virginia (Messina Tr. 47). [A sailboat when moving using its sails is referred to as "sailing", a sailboat when moving using engine power is referred to as "motoring"].

        11.     In 1996 Franklin Lord ("Lord") testified that he purchased a partially completed yacht in Deltaville, Virginia. This vessel was purchased to replace another sailing yacht that he had lost in the Pacific (Lord Tr. 120).[2] That particular 45-foot sailboat called the OCEAN CHILD which Lord owned from 1982 to 1987 was lost in the Pacific Ocean in 1987 when it struck a floating container (Lord Tr. 9-10). Lord recalled that it took him approximately a week to prepare the vessel in Virginia and put into water (Lord Tr. 39). During that week Lord had to install a shaft for the propeller (Lord Tr. 37), installed control cables for the engine (Lord Tr. 38-39), and put in eight (8) through holes (Lord Tr. 39) [a through hole fitting is cut into the hull near or below the waterline and are used for exhaust, entry of sea water for cooling engines, and discharge of waste]. Lord testified that he also installed lexan in the windows, nailed down plywood over hatches (Lord Tr. 140), installed navigation lights (Lord Tr. 142), and put the engine on the

vessel in service. No inspections or surveys were conducted before Lord commenced a

voyage from Virginia to Rhode Island (Lord Tr. 141).  The voyage to Rhode Island was done both in the ocean and in the inland waterways and took approximately thirty (30) hours of motoring (Lord Tr. 142).  The vessel was in a seaworthy condition for the trip to Rhode Island according to Lord and he had no problems operating the vessel during the voyage (Lord Tr. 164).

12.     On arriving in Rhode Island the vessel was removed from the water and taken to Westbury, Rhode Island where it remained for the next 4½ years (Lord Tr. 146).  Over the next 4½ years Lord spent over twelve thousand hours (12,000) working on completely the vessel (Lord Tr. 24).  Lord testified that he worked on the vessel eight hours a day seven days a week (Lord Tr. 24).  Lord personally performed all of the work on completing the vessel with the exception of sub-contracting out work on tables, draws and a Corian counter top for the galley (Lord Tr. 24).  The five thousand dollar ($5,000.00) Corian counter top was the single most expensive material item installed on the vessel (Lord Tr. 31).  During the four and a half years while the vessel was under construction, Lord testified that he purchased many items and materials for the vessel, however he no longer has any receipts, cancelled checks or tax records for those items purchased and installed on the vessel (Lord Tr. 27-28).  Lord testified that he was unable to give even a "good guess" as to how much he spent in total for materials to complete the WANDERLUST (Lord Tr. 41).  Lord testified he was able to recall how much was spent on certain items such as:

| | | |
|---|---|---|
| Winches | $5,000.00 to $10,000.00 | (Lord Tr. 34) |
| Anchor | $  800.00 | (Lord Tr. 35) |
| Windless | $1,200.00 | (Lord Tr. 35) |
| Modifying Hydraulics | $2,500.00 | (Lord Tr. 36) |
| Hydraulic Drives | $3,000.00 | (Lord Tr. 36) |
| Radar | $2,000.00 | (Lord Tr. 43) |
| Autopilot | $3,000.00 | (Lord Tr. 44) |

[2] The reference "Lord Tr.__" refers to pages of Franklin Lord's transcript a copy of which is marked as Exhibit 3.

| | | |
|---|---|---|
| Radio | $1,000.00 | (Lord Tr. 44) |
| GPS | $ 400.00 | (Lord Tr. 45) |
| Refrigeration | $1,400.00 | (Lord Tr. 45) |
| Installation | $ 400.00 | (Lord Tr. 45) |
| Mattress | $1,000.00 | (Lord Tr. 46) |
| Bilge pumps | $2,000.00 | (Lord Tr. 46) |
| Lights | $1,000.00 | (Lord Tr. 47) |
| EPIRB | $ 900.00 | (Lord Tr. 61)[3] |

Lord purchased new or used other items, however he has no recollection as to how much was spent to purchase rigging (Lord Tr. 29), sails (Lord Tr. 30-31), lumber (Lord Tr. 28-29), toilets, sinks and various other items.   In November 2000 the WANDERLUST was finally completed and Lord arranged to have the vessel hauled and placed into the water on November 7, 2000 (Lord Tr. 56).

13.    Lord contacted four or five insurance brokers including International Marine Insurance Service (hereinafter IMIS) when he was seeking insurance coverage for the WANDERLUST (Lord Tr. 20).  He eventually used IMIS because they offered the coverage that Franklin Lord and Sharon Schuman wanted, that is yacht insurance and coverage for the Caribbean  (Lord Tr. 23).   All communications with IMIS were by telephone or telefax and primarily with Mr. Golden (Lord Tr. 21).  Lord told Mr. Golden that the WANDERLUST was a forty-nine foot steel vessel valued at $450,000.00 (Lord Tr. 24; 47), that the vessel was manufactured by Kanter (Lord Tr. 47) and that the vessel had a diesel engine (Lord Tr. 49). Lord admitted that he did not tell the broker that he had personally performed a substantial amount of work on building the vessel (Lord Tr. 48) nor did Lord tell his broker how he arrived at a $450,000.00 value for the vessel (Lord Tr. 48).

14.    Sometime after his initial discussions with his insurance broker, Lord received an Application from IMIS (Lord Tr. 51).  A copy of the IMIS Application is annexed

---

[3] Lord could only recall the cost of the items indicated above, in total these items amount to $35,600.00.

hereto as Exhibit "6".  After receiving the Application Lord filled in numerous items in his own handwriting and signed the document (Lord Tr. 52-54).

15.    On the application in his own handwriting Lord wrote that the "purchase cost" of the vessel was "$450,000.00" even though Lord knew that he had paid $48,000.00 to Sal Messina (Lord Tr. 56-57).  Franklin Lord advised IMIS that the vessel was a year 2000 vessel (Lord Tr. 55).  Lord in fact knew that the hull had been built in 1984 or there about (Lord Tr. 55).

16.    On the Application Lord wrote that the purchase date was "11/07/00" (Lord Tr. 56).  Lord also knew that, "11/07/00" was not the date that he purchased the hull and components for $48,000.00 from Sal Messina (Lord Tr. 56).  The application for insurance states that the engine year is "2000" (Lord Tr. 56-57).  Mr. Lord testified that he does not believe that he told IMIS that the vessel had a 2000 engine only that he had a new engine (Lord Tr. 56-57).  Lord never corrected the engine year on the Application.

17.    On the Application Lord filled in the engine serial number in his own handwriting, however, he does not know the significance of any of the letters or numbers in the serial number (Lord Tr. 57-58).  Lord also filled in, in his own handwriting, the hull identification number for the WANDERLUST.  Lord does not know the significance of the any of the number except for his understanding that the last two numbers indicate the year of manufacturer (Lord Tr. 58-59).  However, Lord does not know if every builder in the world uses the last two digits as the year the hull was built (Lord Tr. 59).

18.    On the Application in his own handwriting where it stated "built at" Mr. Lord wrote "Ontario, Canada" (Lord Tr. 62).  Lord never told the people at IMIS that a

significant portion of the building had been done in, either Rhode Island, Connecticut, Virginia or New Jersey.

19.     Prior to signing the document Lord testified that he never read the statement on the bottom which states:

> "I hereby apply to the company for the insurance described above. I understand that this application forms a basis upon which such insurance may be provided, and therefore, I certify that the representations made herein are true and complete to the best of my knowledge. And that any other facts material to this insurance have been disclosed on the reverse side of the form." (Lord Tr. 64).

20.     Lord testified that he looked over the Application but also stated "who really reads the insurance documents?" (Lord Tr. 55).  After signing the Application it was sent back to IMIS.  Thereafter Lord never advised IMIS that any of the information was either wrong or incomplete in any way (Lord Tr. 65).

21.     On the Application for insurance where it states previous insured the Application states "new purchase".  Mr. Lord testified that he never told his broker IMIS that the vessel was a "new purchase", he only told them that the vessel "the vessel had just been launched" (Lord Tr. 67).

22.     At the time that the defendant's applied for insurance coverage in May, 2001 the WANDERLUST was not a newly purchased 2000 Yacht built by Kanter Yachts in Ontario, Canada with a new 2000 Perkins engine that had been purchased new by the defendants for $450,000.00.  The defendants did not disclose that the WANDERLUST was in fact a vessel with a seventeen (17) year old hull and a fifteen (15) to sixteen (16) year old engine.  Nor did the defendants disclose that the hull had been purchased by another individual by the name of Sal Messina in 1984.  Furthermore, the defendants did not disclose that Kanter

9

had not built any of the decks or interior of the vessel, install the engines, electrical system, plumbing system, insulation or done any of the carpentry work on the vessel nor install riggings, sails and winches for the vessel. The defendants did not disclose that the partially completed vessel had in fact been purchased by them in 1996 for the sum of $48,000.00 nor that in 1996 the vessel had been motored from Virginia to Rhode Island. In addition, defendants failed to disclose that Franklin Lord had personally spent more than 12,000 man hours completing the vessel.

      23.    A fair and reasonable reading of the Application makes it appear that the defendants were applying to insure a newly purchased vessel built by Kanter in Ontario, Canada, which had been purchased for $450,000.00. The defendants knew that these were not the facts, nevertheless the defendants failed to reveal the actual history of the vessels construction, it purchase cost and/or age. The defendants failed to disclose to Commercial Union all known circumstances that materially affected the risk for which they were seeking insurance. The defendants also knew that their insurance broker, IMIS, could not reveal the history of the construction of the vessel, its purchase cost or age because Lord did not inform his broker of this information.

      24.    Based on the undisputed facts, there were non-disclosure of material facts and material misrepresentations made by the defendants to induce the plaintiff

Commercial Union Insurance Company to insure the WANDERLUST and therefore Commercial Union Insurance Company is entitled to void the policy ab initio.

_____
DAVID R. HORNIG

Sworn to before me this
26th day of March, 2004

_____
Notary Public

MARY ANN RAARUP
Notary Public, State of New York
No. 01RA4874099
Qualified in Suffolk County
Certificate filed in New York County
Commission Expires Oct. 20, 20_06_

X:\Public Word Files\1\379\Legal\Affidiavit.David.Hornig.doc

11

## **CERTIFICATION OF SERVICE**

This is to certify that the foregoing AFFIDAVIT was mailed and/or faxed on

this date to the following:

James J. Schultz, Esq.
LAW OFFICES OF JAMES J. SCHULTZ
164 Belridge Road
New Britain, Connecticut 06053

Robert K. Marzik, Esq.
LAW OFFICES OF
  ROBERT K. MARZIK, P.C.
1512 Main Street
Stratford, Connecticut 06615

FRANKLIN LORD, *Pro Se*
177-A Bimini Drive
Palmetto, Florida 34221

Dated: New York, New York
       March 26, 2004

DAVID R. HORNIG
CT Bar No.: ct06120

X:\Public Word Files\1\379\Legal\CERTIFICATE OF SERVICE-DRH.md.doc